UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 1:23-cr-442 (CJN) |
| : | |
| CARROL EDELEN, : | |
| : | |
| Defendant. : | |

### UNITED STATES' MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing with respect to defendant Carrol Edelen. For the reasons herein, the United States requests that the Court sentence the defendant to a period of thirty-six (36) months of incarceration, to be followed by three (3) years of supervised release. The United States is not requesting any fines or restitution in this case, other than required court costs. In support of this sentence, the United States respectfully submits the following.

### FACTUAL AND PROCEDURAL BACKGROUND

In and around October 2022, law enforcement began investigating a narcotics trafficker, identified as Khalil Felder, and his drug sales on and around the 100 block of Yuma Street Southeast, Washington D.C. (hereinafter, the "Yuma Block"). The area functioned as an open-air drug market, with narcotics dealers serving clients who walked up to purchase narcotics. Some dealers, routinely seen by law enforcement operating around the Yuma Block, appeared to be working together to sell drugs, while other dealers appeared to come and go at various times. Through the course of the investigation, law enforcement identified several of the narcotics dealers, including Alphonso Murray, Marquete Murray, Christian Simms, Kevin Penn, Leonard

Short, and James Martin, who appeared to be working together to sell narcotics.[1]

Separately, law enforcement also identified two other key individuals who were working together to sell drugs on and around the Yuma Block: Khalil Felder and Cyrus Wheeler. Specifically, in late October 2022, an undercover officer ("UC") conducted a controlled purchase of fifty zips of fentanyl directly from Felder on the Yuma Block.  During the course of the investigation, in and around June 2023, law enforcement learned that Felder was supplying two other individuals, the defendant and Calvin Wright, who sold drugs in and around Oxon Run Park (hereinafter, "Oxon Run Park"), located at 1200 Mississippi Avenue SE, Washington, D.C.

Working at Oxon Run Park with Wright, the defendant sold fentanyl supplied by Felder, who often came to Oxon Run Park to provide the defendant with a re-supply of narcotics for sale or to pick up drug proceeds.  The narcotics supplied by Felder were often packaged in zips marked with the purple outline of a female figure, known as "purple lady bags" or "naked lady bags."  The defendant also used a flip phone, which was provided by Felder, to communicate with Wright and with drug customers.  On August 10, 2023, an undercover officer ("the UC") entered Oxon Run Park and spoke with Wright, who led the UC over to Edelen.  After the UC provided Wright with $500 in prerecorded funds, the defendant retrieved 53 zips, with a net weight of approximately 9.3 grams, which contained a substance that was later tested and determined to be fentanyl.  The defendant provided the zips to the UC, along with the phone number for the phone provided by Felder, to be used for future purchases of narcotics.

On January 24, 2024, the defendant, along with Felder, Wheeler, and Wright were charged in a superseding indictment with, *inter alia*, Conspiracy to Distribute and Possess with Intent to

---

[1] Alphonso Murray, Marquete Murray, Christian Simms, and Kevin Penn were charged in criminal case 23-cr-419. Leonard Short and James Martin were charged in criminal cases 24-cr-122 and 24-cr-99, respectively.  With the exception of Penn, who remains in fugitive status, those defendants have all pled guilty and been sentenced.

Distribute Fentanyl, in violation of 21 U.S.C. §§ 841 (a)(1), 841(b)(1)(C), and 846.[2]  On January 25, 2024, the defendant was arrested at his residence.  During a search of his residence, law enforcement recovered six rounds of .380 caliber ammunition and one round of .40 caliber ammunition and narcotics packaging, including packaging that bore Felder's distinctive "purple lady" markings.

On February 7, 2025, pursuant to a plea agreement [ECF No. 65], the defendant pled guilty to Count One of the Superseding Indictment, charging Conspiracy to Distribute and Possess with Intent to Distribute Fentanyl, in violation of 21 U.S.C. §§ 841 (a)(1), 841(b)(1)(C), and 846.  Sentencing is currently scheduled for July 14, 2025.

## DISCUSSION AND RECOMMENDATION

### I.   Generally Applicable Legal Principles

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a).  See United States v. Gall, 128 S. Ct. 586, 596 (2007).  The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>    (B) to afford adequate deterrence to criminal conduct;
>    (C) to protect the public from further crimes of the defendant; and
>    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;

---

[2]  On October 8, 2024, Wheeler was sentenced to fifteen months of incarceration.  On June 16, 2025, Wright was sentenced to twenty months of incarceration.  Felder is currently set for sentencing on July 15, 2025.

> (4) the kinds of sentence and the sentencing range established for –
>   (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
>     (i) issued by the Sentencing Commission ...; and
>     (ii) that, . . . are in effect on the date the defendant is sentenced; ...
>
> (5) any pertinent policy statement –
>   (A) issued by the Sentencing Commission ... and
>   (B) that, . . . is in effect on the date the defendant is sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

## II. Defendant's Sentencing Guidelines Calculation

### A. Total Offense Level

The base offense level for a violation of 21 U.S.C. § 846 is governed by U.S.S.G. § 2D1.1. For a defendant that is accountable for less than eight grams of fentanyl but not more than 16 grams of fentanyl as the total amount involved in his relevant criminal conduct, the base offense level is 16. *See* U.S.S.G. §§ 2D1.1(a)(5) and (c)(12). The defendant has also accepted responsibility for the offense, warranting a three-level reduction, pursuant to U.S.S.G. § 3E1.1(a) and (b). Based on the Presentence Investigation Report ("PSR") [ECF No. 83], the total adjusted offense level is therefore 13.

### B. Criminal History Category

The PSR writer calculates the defendant to have a total of 8 criminal history points (placing him in Criminal History Category IV. *See* PSR ¶ 65.

### C. Sentencing Guideline Range

With a total offense level of 13 and a Criminal History that falls in Category IV, the defendant's guidelines range is 24-30 months of incarceration. The guidelines range for supervised release is 3 years. *See* U.S.S.G. § 5D1.2(a)(1) and (c). The guidelines range for a fine is $5,500 to $1,000,000. *See* U.S.S.G. § 5E1.2.

As also noted in the PSR, however, the defendant has two prior convictions that may serve as predicate offenses for purposes of establishing that he is a Career Offender, pursuant to U.S.S.G. §§ 4B1.1(a) and (b)(3): his Second Degree Murder conviction in 1990 FEL 1426, which qualifies as a crime of violence, and his Attempted Possession with Intent to Distribute Heroin conviction in 2020 CF2 1949, which qualifies as a controlled substance offense. *See* PSR ¶ ¶ 56 and 62. In *United States v. Winstead*, 890 F.3d 1082 (D.C. Cir. 2018), the Court held that inchoate offenses, such as the defendant's 2020 Attempted Possession with Intent to Distribute Heroin, do not qualify as predicate offenses for purposes of the Career Offender Guidelines. On November 1, 2023, however, the Guidelines were amended to overrule *Winstead* and to make clear that "[t]he terms 'crime of violence' and 'controlled substance offense' include the offenses of aiding and abetting, attempting to commit, or conspiring to commit any such offense." U.S.S.G. § 4B1.2(d). As a result, the determination of whether the defendant's prior Attempted Possession with Intent to Distribute Heroin qualifies as a predicate offense hinges on whether the Court applies the pre-November 1, 2023 or the amended Guidelines currently in effect.

Although the Guidelines in effect at the time of sentencing should typically govern, due to Ex Post Facto concerns, that is not the case if those Guidelines would result in a higher sentence than the Guidelines that governed at the time of the offense. For a conspiracy offense, however, "[a] defendant who is convicted of a conspiracy that began before, but continued after, a Guidelines amendment became effective may be sentenced based on the amendment without triggering any

ex post facto concerns." *United States v. Aviles*, 518 F.3d 1228, 1230 (11th Cir. 2008); *see also, e.g.*, *United States v. Panos*, 634 F. App'x 123, 125 (5th Cir. 2015) ("Where, as here, a conspiracy has continued after the effective date of a Guidelines enhancement, the Ex Post Facto Clause is not violated by application of the enhancement in sentencing a conspirator, who has not withdrawn from the conspiracy, and to whom it was foreseeable that the conspiracy would continue past the effective date of the amendment.").

As a result, in determining whether to apply the pre-November 1, 2023 Guidelines or the amended Guidelines, the key question is whether the conspiracy charged in Count One, to which the defendant pled guilty, continued after November 1, 2023. Here, although the controlled purchase referenced in the defendant's statement of offense occurred on August 10, 2023, the evidence indicates that the conspiracy continued after November 1, 2023. This evidence includes: 1) three messages (on November 5, November 11, and December 8) sent from the defendant to Felder, which appear to be requesting a resupply of narcotics, including one in which he includes a "down" arrow ("down" is a common reference to fentanyl); 2) the December 13, 2023 recovery of approximately three kilograms of fentanyl from Felder's residence; and 3) the January 25, 2024 recovery of Felder's branded narcotics packaging from the defendant's residence. Because conspiracy is a crime that presumes continuity until accomplishment or termination, once the government proves that a defendant was a member of an ongoing conspiracy, it has proven the defendant's continuous membership in that conspiracy unless and until the defendant withdraws. *United States v. Moore*, 651 F.3d 30, 90 (D.C. Cir. 2011). As a result, the United States respectfully submits that the conspiracy continued after November 1, 2023, and that the amended Guidelines should be applied here.[3]

---

[3] Should the Court agree and apply the amended Guidelines, the defendant would qualify as a Career Offender. As a result, the base offense level would be 32 and the criminal history category would be VI, pursuant to U.S.S.G. § §

### III.     Sentencing Recommendation

As stated above, the United States requests a sentence of thirty-six (36) months of incarceration, to be followed by three (3) years of supervised release.

### A.     The Nature of the Offense

As this Court is aware, the defendant willingly peddled a highly dangerous drug – fentanyl – as a member of an organized conspiracy. The lethality of fentanyl is reflected in nationwide statistics: roughly 97,309 people in this country died of drug overdoses in the 12-month period ending in April 2024. *See* CDC National Center for Health Statistics, *Provisional Drug Overdose Death Counts* (based on provisional data available as of September 1, 2024).[4] Of these deaths, roughly 65,787 (or about 68 percent) involved synthetic opioids (of which fentanyl is one). *Id.* Although the defendant only participated in one controlled purchase involving law enforcement and nothing suggests he had access to larger quantities of narcotics, the defendant and two of his co-conspirators, Felder and Wright, regularly communicated about the sale of narcotics.

Nor was the defendant's involvement in the conspiracy limited in scope or narrowed to only the one controlled purchase on August 10, 2025. For example, on August 23, 2023, the undercover officer (the "UC") who previously purchased from the defendant returned to Oxon Run and asked the defendant, "Can I holler at you?" The defendant then responded, "I ain't got nothing...probably about two hours..." before asking the UC if s/he was law enforcement. The UC denied being law enforcement and asked how many times s/he had to go through this. The

---

4B1.1(a) and (b)(3), resulting in a guidelines range of 151-188 months.

[4] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.

defendant advised that other people were saying the UC was law enforcement and that he wanted to "clear it up" before "making a move" with the UC. After the UC watched the defendant sell narcotics to an unidentified drug user, s/he asking again if the defendant would sell to the UC. The defendant said no, advising, "I just came home from doing 21 years, I ain't going back."

Put simply, the defendant's participation in the conspiracy was not minimal, nor was it incidental. On the contrary, he was a key part of Felder's street level drug operations. Indeed, the significant role that the defendant played is further illustrated by the fact that Felder forwarded calls from one of his own phones, used by him for drug trafficking, to the cellphone he had purchased for the defendant to use as part of the conspiracy.

### B.  The History and Characteristics of the Defendant

First, the United States recognizes and commends the defendant's decision to accept responsibility in this case. The United States further notes that he was one of the first to indicate his intent to do so. What is concerning, however, is the defendant's extensive criminal history – which runs the gamut from driving under the influence and drug offenses to violent crimes, including convictions for attempted robbery and second-degree murder. Indeed, notwithstanding what appears to have been a stable upbringing, the instant offense represents the defendant's tenth adult conviction, with convictions spanning his entire life since the age of 18.

As detailed in the PSR, however, it is also clear that there are some mitigating factors, including the defendant's lifelong substance abuse issues, which continued until the time of his arrest in this case, as well as his age and ongoing health issues.

### C.  The Need for the Sentence Imposed

Given the defendant's history and characteristics and the nature of the conduct in this case, the United States respectfully requests a sentence of thirty-six (36) months of incarceration, to be

followed by three (3) years of supervised release. Such a sentence is sufficient, but not greater than necessary, to deter future criminal conduct by the defendant, particularly given that he will be on a period of supervised release following any incarceration. As the Court is aware, his co-defendant Wheeler, who had a similar criminal history (IV) and was responsible for a lower level of narcotics, received a sentence of 15 months. His other co-defendant Wright, with a limited criminal history score (I), had a firearm and was responsible for the same quantity of narcotics, and he received a sentence of 20 months.

As a result, the United States submits that a sentence of thirty-six months will be sufficient but not greater than necessary to promote respect for the law and deter the defendant from future criminal conduct. It will also serve to prevent unwarranted sentencing disparities between this defendant and others sentenced in this case and the related matters, when considering their individual conduct. It would also allow the defendant time to receive necessary substance abuse and other treatment. Moreover, the United States respectfully submits that a period of supervised release – thirty-six months – is also appropriate and necessary to facilitate the defendant's re-entry into the community upon his release from imprisonment, given his history of relapse.

Respectfully submitted,

JEANINE FERRIS PIRRO
INTERIM UNITED STATES ATTORNEY

By:
/s/ Andrea Duvall
Andrea Duvall
AR Bar 2013114
Assistant United States Attorney
U.S. Attorney's Office
601 D Street, NW
Washington, D.C. 20530
(202) 252- 2408
andrea.duvall@usdoj.gov